UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

DEONDRA WILSON, INDIVIDUALLY AND ON        CIVIL ACTION NO. 3:20-cv-00351
BEHALF OF HER MINOR CHILD,
TA'LAYSHIA WILSON, SURVIVING HEIR OF       JUDGE TERRY A. DOUGHTY
THOMAS JOHNSON, III, DECEASED AND
THOMAS JOHNSON, JR.                        MAGISTRATE JUDGE KAYLA D.
                                           MCCLUSKY
VERSUS

THE CITY OF BASTROP THROUGH HENRY
COTTON, MAYOR;
BASTROP POLICE DEPARTMENT ("BPD"),
THROUGH ALLAN CAMPBELL,
CHIEF OF POLICE;
JOSHUA A. GREEN, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY AS "BPD" POLICE
OFFICER AND JOHN L. MCKINNEY,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS "BPD" POLICE OFFICER

## RULING

This lawsuit follows the death of Thomas Johnson, III, ("Johnson") who was shot and killed

by Bastrop Police officers while fleeing on foot, armed with a firearm. Plaintiffs are his heirs.

Pending here is Defendants' "Motion for Summary Judgment on the Issue of Joshua A. Green and

John L. McKinney's Qualified Immunity," [Doc. No. 23]. Plaintiffs have filed an opposition [Doc.

Nos. 32, 36]. Movers have filed a reply to the opposition [Doc. No. 37].

The police officer Defendants who were involved in the shooting, Joshua A. Green

("Green") and John L. McKinney ("McKinney"), contend they are entitled to qualified immunity

from Plaintiffs' claims. Further, because there was no constitutional violation by Green or

McKinney, the movers submit that there can be no liability on the part of the Defendants City of

Bastrop and Bastrop Police Department.

Plaintiffs oppose the motion on the grounds that the use of force by both Green and McKinney was excessive.

For the following reasons, the Motion for Summary Judgment [Doc. No. 23] is GRANTED.

## I.       FACTS AND PROCEDURAL HISTORY

On March 19, 2019, at approximately 3:10 p.m., Bastrop Police received a 911 emergency call reporting that someone in a red truck with rims pulled a gun on someone at the Eden Apartments.  The individual was identified as Thomas Johnson.[1]  Shortly before this call, Bastrop Police received another call reporting that "they are drawing guns" over at Eden Apartments.[2]  The police dispatcher alerted Bastrop Police officers via radio communication of the two 911 calls and gave a vehicle description of a red truck with rims in the vicinity of the Eden Apartments and identified "Thomas Johnson."[3]

Green was working as a patrol officer for the Bastrop Police Department and was handling a domestic dispute call when the dispatch about the Eden Apartments 911 calls came over the radio.[4]  Green spoke to one of his Captains about the dispatch and proceeded toward the Eden Apartments.[5]

Before reaching the Eden Apartments, Green initiated a vehicle stop of a red vehicle with rims on Kammell Street just outside of the Eden Apartments.[6] Green instructed the driver to stop

---

1  Bastrop PD 911 Recording, [Doc. No. 23-3].
2  Bastrop PD 911 Recording, [Doc. No. 23-4].
3  Bastrop Dispatch Recording, [Doc. No. 23-5]; *see also* excerpts of the deposition of Officer Green, [Doc. No. 23-6, at pp. 25, 28 ].
4  Green deposition, [Doc.No. 23-6, p. 26]
5  Green deposition [Id., p. 45-46] *see also* the video recording from Officer Green's dash mounted camera, [Doc. No. 23-7, at 24:29; Green SP Exhibit 7, 5:00].
6  Green deposition [Doc. No. 23-6, pp. 31-32]; Green Dash Cam [Doc. No. 23-7, 26:15; Green SP Exhibit 7, 6:15].

the vehicle and turn off the vehicle.[7] As Green exited his police unit, the passenger of the vehicle, Johnson, opened the passenger door and stepped to the ground.[8]  Green instructed Johnson to close the door.[9]

Green testified that prior to Johnson exiting the vehicle, Green visually observed a silver firearm in Johnson's grasp pointing towards him through the rear of the vehicle.  Plaintiffs contend that Green's dashcam video does not show Johnson pointing a firearm at Green, and, further, that Green did not mention seeing a Johnson pointing a firearm at him during the initial investigations of the incident. [10]

Johnson began to run toward H.V. Adams Elementary.[11]  Green testified that he feared that Johnson was going to enter the school and that he (Green) was unaware that the school had been closed a few months earlier. [12]  Green visually observed a silver semiautomatic handgun in Johnson's hand with an extended magazine.[13]  Green gave verbal commands for Johnson to stop and drop the gun, which Johnson did not obey.[14]  Green's dashcam video shows a vehicle passing along a driveway in front of the school in the direct path of Johnson as he ran from Green.[15]

Green pursued Johnson on foot into an open field adjacent to the school and to the east of

---

7   Green deposition [Doc. No. 23-6, at p. 32]; Green Dash Cam [Doc. No. 23-7, 26:29, 27:01].
8   Green Dash Cam [Id., 27:03.]
9   Green deposition [Doc. No. 23-6, at p. 37]; Green Dash Cam [Doc. No. 23-7, 27:06; Green SP [Doc. No. 23-9, p. 11].
10  Green deposition [Doc. No. 23-6, pp. 34-35].
11  Green deposition [Id., p. 51]; Green Dash Cam [Doc.No. 23-7, 27:10].
12  Recording of Green's IA Interview, [Doc. No. 23-8, at 8:06]; *see also* recording of Officer Green's State Police interview, [Doc. No. 23-9, 13:55, 34:39]. During his deposition given in October 2020, around a year and a half after the incident, Green testified that he could not recall whether he knew the school was closed. [Doc. No. 23-6, pp. 76-77].
13  Green deposition [Doc. No. 23-6, pp. 22, 23, 34, 55]; Green Dash Cam [Doc. No. 23-7, 27:06]; Green IA [Doc. No. 23-8, p. 8]; Green SP [Doc. No. 23-9, p. 12].
14  Green deposition [Doc. No. 23-6, p. 38]; Green Dash Cam [Doc. No. 23-7, 27:08]; Green SP [Doc. No. 23-9, p. 12.]
15  Green Dash Cam [Doc. No. 23-7, 27:08, 27:40.]

Kammell Street, and Green repeated commands for Johnson to drop the gun.[16]  Johnson was running in the direction of other individuals within the field and failed to comply with commands to stop and drop the gun.[17]  Green testified that he could see the barrel of Johnson's semiautomatic handgun come up toward him as Johnson ran and that he observed Johnson looking over his shoulder to determine Green's location.[18]  Green testified that he was in fear for his life and for the safety of others, and he engaged Johnson with his gun.[19]  Green further testified that, because it was around 3:00 p.m., he believed that someone could be at the school.[20]

Green continued to give loud verbal commands for Johnson to drop his weapon, but Johnson continued to disobey those commands and flee.[21]  Green testified that he was concerned that, because he had no cover or concealment, Johnson could abruptly turn around and engage him with his weapon at any time.[22]  Green stated that he did not want Johnson getting to the school and possibly taking hostages.[23]  Green told State Police investigators that he did not want to die in that field.[24]  Green saw Johnson running toward two people walking to his left and gave them commands to lay on the ground in fear that Johnson might try to take them hostage.[25]

Officer McKinney was also working patrol on March 19, 2019.[26]  McKinney heard Green communicate over the radio "gun!" and "shots fired" and proceeded to the area.[27]  McKinney feared that Johnson had fired his gun at Green.[28]  As McKinney approached Green and Johnson's

---

16  Green deposition [Doc. No. 23-6, pp. 55 – 56]; Green Dash Cam [Doc. No. 23-7, 27:10.]
17  Green deposition [Doc. No. 23-6, pp. 39, 56.]
18  Green IA [Doc. No. 23-8, 8:21]; Green SP [Doc. No. 23-9, 12:26.]
19  Green IA [Doc. No. 23-8, 8:41]; Green SP [Doc. No. 23-9, 13:27.]
20  Green SP [Id., 13:30.]
21  Green IA [Doc. No. 23-8, 8:56]; Green SP [Doc. No. 23-9, 12:56.]
22  Green deposition [Doc. No. 23-6, p.56]; Green SP [Doc. No. 23-9, 13:38.]
23  Green's SP [Id., 14:00.]
24  Green's SP [Id., 14:10.]
25  Green IA [Doc. No. 23-8, 10:19]; Green deposition [Doc. No. 23-6, p. 39]
26  McKinney deposition [Doc. No. 23-10, p. 10]
27  McKinney deposition [Id., p. 29 – 30]; McKinney's State Police interview recording [Doc. No. 23-13, at 4:20.]
28  McKinney SP [Id., 5:18.]

location from the east on Corky Avenue at the T-intersection with Riis Street, he observed Johnson running in his direction.[29]

Green observed Johnson running in McKinney's direction and Green thought Johnson was going to kill McKinney.[30]  Green communicated to McKinney by radio that Johnson was heading in his direction.[31]  Green changed magazines in a tactical reload of his weapon due to the continued threat and understanding that Johnson's gun had an extended magazine.[32]

McKinney observed the gun with an extended magazine in Johnson's right hand.[33] Johnson was holding the gun in his right hand such that he could turn and fire the weapon at any moment.[34]  After initially running toward the elementary school, Johnson turned south near the location where McKinney was arriving in his police unit and began running south along Riis Street toward the Eden Apartments where the 911 calls originated.[35]  Green lost visual contact with Johnson as he turned to the south due to a large tree/bush that obstructed his view.[36]

McKinney gave several commands to Johnson to drop the gun, but Johnson did not comply.[37]  McKinney fired at Johnson from between his police unit and driver's side door because he thought Johnson was firing his gun.[38]  During this time, McKinney could hear gunshots but

---

29  McKinney Dash Cam [Doc. No. 23-11, 1:17] (Johnson can first be identified on the video at 1:17 between two tall trees where Corky Street dead ends in Riis Street).
30  Green SP [Doc. No. 23-9, 18:09.]
31  McKinney SP [Doc. No. 23-12, 4:02.]
32  Green IA [Doc. No. 23-8, 17:00; Doc. No. 23-9, 18:29.]
33  McKinney's IA Interview [Doc. No. 23-12, at 3:55]; McKinney SP [Doc. No. 23-13, 6:00]; McKinney deposition [Doc. No. 23-10, pp. 86 – 87.]
34  McKinney deposition [Id., pp. 86 – 87.]
35  Green deposition [Doc. No. 23-6, p.63]; McKinney Dash Cam [Doc.No. 23-11, 1:17] (Johnson can first be identified on the video at 1:17 between two tall trees where Corky Street dead ends in Riis Street); McKinney deposition [Doc. No. 23-10, p. 34]; Green SP [Doc. No. 23-9, 19:10.]
36  Green IA [Doc. No. 23-8, 11:39.]
37  McKinney IA Doc. No. 23-12, 4:11]; McKinney deposition [Doc. No. 23-10, p. 41]; Green IA [Doc. No. 23-8, 11:55]; McKinney SP [Doc. No. 23-13, 6:13.]
38  McKinney deposition [Doc. No. 23-10, p. 41.]

could not determine where they were coming from and thought they were fired by Johnson.[39] McKinney testified that he felt that his life was threatened when he came on the scene, saw Johnson with the gun, and heard gunshots.[40]  After McKinney fired, Johnson fell to the ground, turned around and faced McKinney, picked up the gun, and continued to flee.[41]  McKinney stepped out and around his police unit and fired three more shots.[42]

Green heard gunshots but did not know who was firing.[43]  Green could not see McKinney and feared that Johnson had killed him.[44]  Green saw Johnson fall to the ground, get back to his feet, and continue running toward the Eden Apartments.[45]  Until this time, McKinney's view of Green was obstructed by trees and, as he moved forward toward Johnson, he was relieved to see Green in the field to his right because he thought Green had been shot.[46]

Green got into a kneeling position and engaged Johnson with his firearm.[47] Green could still see the gun in Johnson's hand.[48]  Green did not want to allow Johnson to make it back to the Eden Apartments where the 911 calls originated and allow Johnson to have better cover and concealment and be in the vicinity of bystanders.[49]  Green observed multiple onlookers from the Eden Apartments walking in the area.[50]  Green wanted to stop Johnson before he could hurt him or anyone else.[51]

---

39 McKinney deposition [Doc. No. 23-10, pp. 41, 42.]
40 [Id., p. 74-75]
41 [Id., p.41.]
42 [Id., p. 43]
43 Green IA [Doc. No. 23-8, 11:58]; Green SP [Doc. No. 23-9, 20:05.]
44 Green IA [Doc. No. 23-8, 12:05]; Green SP [Doc. No. 23-9, 20:05.]
45 Green IA [Doc. No. 23-8, 12:29]; Green SP [Doc. No. 23-9, 20:30.]
46 McKinney deposition [Doc. No. 23-10, p. 44]
47 Green IA [Doc. No. 23-8, 12:59]; Green SP [Doc. No. 23-9, 21:49.]
48 Green IA [Doc. No. 23-8, 13:05]. Green SP [Doc. No. 23-9, 21:42.]
49 Green SP [Doc. No. 23-9, 22:19.]
50 [Id., 22:55.]
51 [Id., 23:08.]

Green observed Johnson throw the gun to his right and fall to the ground.[52]  Green did not see McKinney until after Johnson fell to the ground.[53]  McKinney also visually observed Johnson throw the gun from his right hand to the ground and McKinney alerted the other officers that "I got eyes on the gun."[54]

Johnson died from his gunshot wounds.  On March 18, 2020, this lawsuit was filed by DeOndra Wilson, on behalf of herself and her minor child, Ta'layshia Wilson, heir and surviving child of Johnson; and Thomas Johnson, Jr., the twin brother of Johnson.  Plaintiffs allege that Defendants used excessive and deadly force under color of law in violation of Johnson's individual rights under the Fourth Amendment of the United States Constitution and in violation of his civil rights pursuant to 42 United States Code Section 1983 and Louisiana Civil Code art. 2315 *et seq.*

On May 26, 2020, the Court granted Defendants' motion to limit discovery to the issue of Green's and McKinney's qualified immunity, so that that issue could be determined at the earliest possible stage in this litigation.  [Doc. No. 14].

On February 1, 2021, Defendants Green and McKinney filed the pending motion [Doc. No. 23] in which they contend they are entitled to judgment as a matter of law dismissing Plaintiffs' claims against them on the grounds of qualified immunity.  The motion is fully briefed, and the Court is prepared to rule.

## II.   LAW AND ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

52  Green IA [Doc. No. 23-8, 13:16.]
53  [Id., 15:11.]
54  McKinney deposition [Doc. No. 23-10, p. 44]

P. 56(a).  A dispute is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Hamilton v. Segue Software, Inc.,* 232 F.3d 473, 477 (5th Cir. 2000). A fact issue is "material" if its resolution could affect the outcome of the action. *Id.*  Although evidence is reviewed in the light most favorable to the nonmoving party, the Fifth Circuit has instructed that courts assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston,* 636 F.3d 183, 187 (5th Cir. 2011). A court "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott v. Harris,* 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)); *see also Hale v. City of Biloxi, Mississippi*, 731 Fed. Appx. 259 (5th Cir. 2016); *Guerra v. Bellino*, 703 Fed. Appx. 312 (5th Cir. 2017); *Singleton v. Darby*, 609 Fed. Appx. 190 (5th Cir. 2015).

"Although [qualified immunity is] nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).  This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. *See* Fed. R. Civ. P. 56(c); *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016).  After a 2010 revision to Rule 56, "materials cited to support or dispute a fact need only be capable of being 'presented in a form that would be admissible in evidence.'" *LSR*

*Consulting, LLC*, 835 F.3d at 534 (quoting Fed. R. Civ. P. 56(c)(2)).  This flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense it takes to authenticate everything in the record. *See* Fed. R. Civ. P. 56(c)(1)(A).

In support of their motion, Green and McKinney submit a variety of interview recordings and dash camera videos, all of which they contend are capable of being presented in a form that would be admissible in evidence and, as such, are competent summary judgment evidence.

### B.     Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982).  The Supreme Court has recognized the importance of granting qualified immunity prior to trial when officers make reasonable but mistaken judgments, because "qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551-552 (2017). The Supreme Court has recognized the potency of the immunity: qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The burden is on the plaintiff to overcome the defense. *Bourne v.*

*Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).

The Court must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison. *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) (citing *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir.2009) (quoting *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)); *see also Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (observing that this "area is one in which the result depends very much on the facts of each case"). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

"The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham v. Connor*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137–139 (1978); *Terry*, 392 U.S. at 21).

To overcome the claim of qualified immunity on their claim of excessive force, Plaintiffs must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole, supra* (quoting

10

*Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)).  In determining whether the use of force was clearly excessive and clearly unreasonable, the Court evaluates each deputy's actions separately, to the extent possible. *Id*. (citing *Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether qualified immunity applies).

Green and McKinney contend that Plaintiffs have not shown that either of them violated any of Johnson's constitutional rights or that existing law clearly established that they acted unlawfully.

### 1.    Did Green or McKinney violate Johnson's constitutional rights?

In excessive force cases, officers are generally entitled to qualified immunity "even when [they] act negligently, or when they could have used another method to subdue a suspect, or when they created the dangerous situation, or when the law governing their behavior in particular circumstances is unclear." *Albert v. City of Petal*, 2019 WL 10736149, * 11 (S.D. Miss. Sept. 30, 2019) (quoting *Mason v. Paul*, 929 F.3d 762, 763 (5th Cir. 2019). Moreover, courts are not permitted to "hold officers liable from the safety of our 20/20 vision of hindsight for decisions taken in a split-second under potentially life-threatening conditions." *Id*.  Rather, the Court "applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).

"[W]hat matters is what the defendant officers knew when they shot [Johnson]." *Cole v. Carson*, 935 F.3d 444, 456 (5th Cir.2019), as revised (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S.Ct. 111; 207 L.Ed.2d 1051 (2020). The Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. at 396.

"An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or others." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (emphasis added); *Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016).

Defendants assert that the undisputed facts in this case confirm that both Green and McKinney had reason to believe that Johnson posed a threat of serious harm to them and others in the area.

### a.      Officer Green

Green was responding to reports that Johnson had pulled a gun on someone at the Eden Apartments.  Green testified that after he initiated the vehicle stop, he visually observed through the rear of the vehicle a silver firearm in Johnson's grasp pointing towards him.  Johnson disobeyed commands to stay in the vehicle, exited the vehicle with a semiautomatic weapon with an extended magazine in his hand, and began running in the direction of an elementary school.  Green feared that Johnson would enter the school and was not aware the school had been closed.

Green gave verbal commands for Johnson to stop and drop the gun, which he did not obey. A vehicle was driving along a driveway in front of the school in Johnson's vicinity as he was running from Green.  Green pursued Johnson on foot into the open field adjacent to the school and to the east of Kammell Street and repeated commands for Johnson to drop the gun.  Johnson was running in the direction of other individuals within the field and failed to comply with commands to stop and drop the gun.  Importantly, Green could see the barrel of Johnson's semiautomatic

handgun come up and point toward him as Johnson ran while Johnson looked over his shoulder to determine Green's location. Green feared for his life and the safety of others as he engaged Johnson with his gun.

Green was concerned that because he had no cover or concealment, Johnson could abruptly turn around and engage him with his weapon at any time. He also stated that he did not want Johnson getting to the school and possibly taking hostages. Green told State Police investigators that he did not want to die in that field.

Green saw Johnson running in the direction of his partner, McKinney, and thought Johnson was going to kill him. Green communicated to McKinney by radio that Johnson was heading in his direction. Green changed magazines in a tactical reload of his weapon due to the continued threat and because he knew that Johnson's gun had an extended magazine. Green lost visual contact with Johnson as he turned to the south due to a large tree/bush that obstructed his view. Green heard gunshots but did not who was firing. Green could not see McKinney and feared that Johnson had killed him.

Green saw Johnson fall to the ground, get back to his feet, and continue running towards the Eden Apartments. Green could still see the gun in Johnson's hand. Green did not want to allow Johnson to make it back to the Eden Apartments where the 911 calls originated, which would allow Johnson to have better cover and concealment while possibly in the vicinity of bystanders. Green also observed multiple onlookers from the Eden Apartments walking in the area. Green wanted to stop Johnson before he could hurt him or anyone else.

### b.    Officer McKinney

McKinney heard Green communicate loudly over the radio "gun" and "shots fired" and proceeded to the area. McKinney feared that Johnson had fired his gun at Green. As McKinney

approached Green and Johnson's location from the east on Corky Avenue at the T-intersection with Riis Street, he observed Johnson running in his direction.  Green also communicated to McKinney by radio that Johnson was heading in his direction.

McKinney observed Johnson's gun with an extended magazine in his right hand. Johnson could have turned and fired the weapon at any moment. After initially running toward the elementary school, Johnson turned south near the location where McKinney was arriving in his police unit and began running south along Riis Street toward the Eden Apartments where the 911 calls originated.

McKinney gave several commands to Johnson to drop the gun, but Johnson did not comply. McKinney fired at Johnson from between his police unit and driver's side door because he thought Johnson was firing his gun.  McKinney could hear gunshots but could not determine where they were coming from and thought they were fired by Johnson.  McKinney felt that his life was threatened when he came on the scene, saw Johnson with the gun, and heard gunshots.

After McKinney fired, Johnson fell to the ground, turned around to face McKinney, picked up the gun, and continued to flee.  McKinney stepped out and around his police unit and fired three more shots.  McKinney's view of Green was obstructed by trees and, as he moved forward toward Johnson, he was relieved to see Green in the field to his right because he thought Green had been shot.

### c.      Was Green and McKinney's Use of Force Presumptively Reasonable?

Green and McKinney contend that there is ample evidence that each of them had reason to believe that Johnson posed a threat of serious harm to them and others in the area.  Green was confronted with a suspect (1) who had previously pulled a gun on someone at the Eden Apartments; (2) who proceeded to disobey a command and flee from a vehicle stop armed with a semiautomatic

14

weapon with an extended magazine; (3) who ran in the direction of an elementary school around 3:00 p.m. on a school day; (4) who disobeyed every command to stop and drop his weapon; (5) who proceeded to run with a gun in his hand in the direction of another vehicle, of other people in the area, and in the direction of his partner; and (6) who then proceeded to run back toward the location where the 911 emergency calls originated in the Eden Apartments where onlookers were gathering.

McKinney was confronted with (1) distressed calls of "gun!" and "shots fired" from his partner; (2) arriving on the scene to immediately see the suspect carrying a semiautomatic weapon with an extended magazine; (3) a suspect who disobeyed every command to stop and drop his weapon; (4) hearing gunshots but not knowing where they were coming from; (5) the possibility that his partner had been shot and killed by the suspect; and (6) a fleeing suspect headed toward the location where the 911 emergency calls originated in the Eden Apartments.

In light of this undisputed evidence, Green and McKinney assert that their use of force was presumptively reasonable under the circumstances. Johnson was in possession of a deadly weapon. He had reportedly pulled the weapon on someone at the Eden Apartments. He was non-compliant with commands and attempted to evade arrest by flight. He posed a serious risk to Green, McKinney, and anyone in his vicinity.

Plaintiffs respond that Johnson was running away from the officers, that he never pointed the gun at them, and that he never posed a threat. Plaintiffs assert that although Green now contends that he saw Johnson point a firearm at him while still in the truck, Green failed to make that contention when he was interviewed by the Louisiana State Police or when he was interviewed during the internal affairs proceeding. Plaintiffs further assert that the dash cam video does not show Johnson pointing a gun at Green. Plaintiffs argue that this is a crucial material fact, which

requires a credibility call, making summary judgment inappropriate.

Plaintiffs additionally contend that Green's statement that he believed Johnson posed a threat to the students at the A.V. Adams Elementary School is not credible because it was common knowledge that the school was permanently closed.

With regard to McKinney, Plaintiffs argue he never heard anyone state over the radio that Johnson had shot anyone, Johnson was running away from him, and Johnson posed no threat.

The Court has carefully reviewed Green's dashcam video, which clearly shows that Johnson exited the vehicle with a gun in his hand and that Johnson disobeyed Green's commands to stop and to drop the gun. Therefore, there is no need to rely on Green's credibility to establish those facts.   The Court has also viewed McKinney's dashcam video. As noted above, a court "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Carnaby, supra* (quoting *Scott v. Harris, supra*); *see also Hale v. City of Biloxi, Mississippi, supra*; *Guerra v. Bellino, supra*; *Singleton v. Darby, supra*.   Although evidence is reviewed in the light most favorable to the nonmoving party, the Fifth Circuit has instructed that courts assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. *Carnaby, supra.*

To the extent that Plaintiffs attempt to create an issue of fact as to whether Johnson was in possession of a gun at the time that he fled officers and refused to obey commands, the Court can consider the facts in the light depicted in the dash camera videos.  Plaintiffs have failed to establish a genuine dispute of material fact as to whether Johnson was in possession of a gun.  Indeed, his own expert acknowledges that he was in possession of a gun. [55]  Wilson and Johnson, Jr.'s

---

[55] Grafton deposition, [Doc. No. 23-14, p. 41]

testimony that is contrary to what the video depicts, and contrary to the acknowledgement of their own expert, cannot create a genuine dispute of material fact.

Additionally, Johnson had reportedly pulled the weapon on someone at the Eden Apartments. He was non-compliant with repeated commands and attempted to evade arrest by flight while still in possession of a handgun. He posed a serious risk to Green, McKinney, and anyone in his vicinity.

As indicated above, an officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or others. *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d at 382; *Orr v. Copeland*, 844 F.3d at 493.

The fact that Johnson was fleeing does not change the analysis. Green described the barrel of Johnson's weapon rising in his direction with every stride he took. The Fifth Circuit has "never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *Garcia v. Blevins*, 957 F.3d 596, 598 (5th Cir. 2020), *cert. denied*, 20-498, 2021 WL 78130 (U.S. Jan. 11, 2021) (quoting *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 (5th Cir. 2016), as revised (June 16, 2016)) Because he refused to comply with repeated verbal commands to drop his weapon, he had the ability at any time to abruptly turn and engage either Green, McKinney, or any other individual in the vicinity.

The Court finds that Plaintiffs have not carried their burden of establishing a genuine factual dispute as to whether Green or McKinney committed a constitutional violation. They are, therefore, entitled to qualified immunity. Nevertheless, assuming *arguendo* that Plaintiffs have created a genuine factual dispute as to whether there was a constitutional violation, the Court will consider whether Plaintiffs have shown a violation of clearly established law.

### 2.      Cleary Established Law

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).  The United State Supreme Court has repeatedly instructed that clearly established law should not be defined at a high level of generality.  *Ashcroft*, 563 U.S. at 742 (2011). The question must be "frame[d] . . . with specificity and granularity." *Garcia v. Blevins*, 957 F.3d at 600 (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)). "Because this specificity is especially important in the Fourth Amendment context, the Supreme Court has stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020) (internal quotations omitted) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

With the more specific inquiry the Supreme Court requires, "the question becomes whether there is either 'directly controlling authority . . . establishing the illegality of such conduct' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Gonzalez v. Huerta*, 826 F.3d 854, 858 (5th Cir. 2016) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Although the Supreme Court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citing *White v. Pauly*, 137 S.Ct. 548, 551 (2017). In *White*, the Court reminded lower courts that clearly established law

18

must be "particularized" to the facts of the case. The judgment of the appellate court was vacated because it relied on general constitutional principles that did not identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.

Overcoming qualified immunity is "especially difficult in excessive-force cases" as it "is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Morrow*, 917 F.3d at 876 (quoting *Kisela*, 138 S.Ct. at 1153). Excessive-force claims "often turn on 'split-second decisions' to use lethal force," *Morrow, supra* (citing *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009)), which means "the law must be so clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Id*.

Plaintiffs have the burden of establishing that Green and McKinney violated a constitutional right and that the constitutional right was clearly established at the time of its violation. *Magee v. Reed*, 2015 WL 5020252 (E.D. La. 8/19/2015). Plaintiffs must point to case law clearly establishing that Green and McKinney acted unreasonably based on facts similar to the particular circumstances they faced with Plaintiff. *See Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *Cass v. City of Abilene*, 814 F.3d 721, 732 (5th Cir. 2016) (*per curiam*).

Here, however, Plaintiffs have not pointed to any case law to support the contention that the right to disobey lawful orders of police officers to stop and drop a semiautomatic weapon while posing a threat to the officer and surrounding community was an established constitutional right at the time. Plaintiffs have not demonstrated that every reasonable officer would understand that Green and McKinney's use of force in trying to eliminate a serious threat to themselves and others violated Johnson's Fourth Amendment rights.

Instead, Plaintiffs contend that the factual situation in *Amador v. Vasquez*, #17-51001, 952 F.3d 624 (5th Cir. 2020), is analogous to the situation here.  In *Amador*, the Court found that a reasonable officer would have understood that using deadly force on a man holding a knife, but standing nearly thirty feet away from the deputies, motionless, and with his hands in the air for several seconds, would violate the Fourth Amendment. However, the facts here are clearly distinguishable from those in *Amador*.

The Fifth Circuit recently considered a similar factual scenario and held that the officer (Blevins) was entitled to qualified immunity after shooting the suspect (Garcia):

> **\*8** Blevins, having just twice broken up fighting in the restaurant in which Garcia was involved, was told someone in the parking lot had a gun. He saw Garcia walking, gun in hand, towards other people in the parking lot. Garcia ignored Blevins' commands to drop the weapon, first ducking between parked vehicles and then trying to give the gun to someone else. Even under Plaintiffs' version of events, it is undisputed that—although he may have put his hands up at some point—Garcia refused to drop the gun when ordered to do so, and he could have quickly turned it on Blevins. "[W]e have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 n.6 (5th Cir. 2016), *as revised* (June 16, 2016). Here, we cannot say the law was "*so* clearly established that—in the blink of an eye ...— every reasonable officer would know it immediately." *Morrow*, 917 F.3d at 876. We therefore hold Blevins is entitled to qualified immunity because he did not violate clearly established law.

*Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020).

The court further emphasized it was undisputed that "Garcia knew of Blevins' presence, that Blevins ordered Garcia to drop the gun, and that Garcia was holding the weapon in such a way that he could have turned it quickly on Blevins." *Id.*, at p. fn. 2. Likewise, in the instant case, it is undisputed that Johnson knew of the officers' presence, that the officers ordered Johnson to drop the gun, and that Johnson was holding the gun in such a way that he could have turned it quickly

on the officers. Green and McKinney, like Blevins in *Garcia*, are entitled to qualified immunity.

Other Fifth Circuit jurisprudence considering similar factual scenarios is also instructive. For instance, the Fifth Circuit has denied excessive force claims in cases where the arrestee *appeared* to have a gun. See e.g. *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009), citing cases. (This court has found an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon.); *Ramirez v. Knoulton*, 542 F.3d 124, 131 (5th Cir. 2008) (Arrestee repeatedly refused the officers' commands, stood, armed, several yards from the officers, brought his hands together in what could reasonably be interpreted as a threatening gesture, as if to grip the handgun with both hands in preparation to aim it at the officers.); *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991) (Arrestee, while seated in a car which had come to an abrupt stop, twice failed to comply with officer's demands when reaching down below the officer's sight line.) The instant case lacks the possibility that the arrestee had a gun and the uncertainty regarding the arrestee's movements present in the foregoing cases. Johnson *did* have a gun, and the officers *knew* that Johnson had a gun and repeatedly ordered him to drop it, yet Johnson failed to comply and was admittedly handling the gun as he fled.

Plaintiffs argue that Johnson never posed a threat to the officers, because he never pointed the gun at the officers. Whether a fleeing suspect posed a subjective threat is immaterial. The arrestee's "subjective intent is irrelevant where the only issue is what a reasonable officer would have believed under these circumstances." *Ramirez v. Knoulton*, 542 F.3d at 131. Like the officer in *Garcia, supra*, Green and McKinney encountered an unprovoked fleeing individual who had a gun and refused to drop it despite repeated commands to do so.

Under the circumstances with which they were presented, Green and McKinney's use of

force to remove the threat posed by Johnson after he refused to comply with repeated commands to stop and drop his weapon cannot be said to be a violation of clearly established law. Viewed objectively, Plaintiffs are unable to establish that *every reasonable officer* in Green or McKinney's position would understand that this use of force was an alleged constitutional violation.

### 3.      Can Plaintiffs' Expert Defeat Summary Judgment?

The record reflects that Plaintiffs have retained a police procedures expert, Lloyd Grafton. However, Plaintiffs have not cited Grafton's report or testimony in their opposition.  Therefore, he cannot defeat summary judgment.

Even if Plaintiffs had cited Grafton in their opposition, Defendants have filed a contemporaneous motion to exclude and/or limit the expert opinions of Plaintiff's police procedures expert, Lloyd Grafton. [Doc. No. 24].  In support of their motion for summary judgment, Defendants argue that Grafton's opinions as to the reasonableness of an officer's use of deadly force are inadmissible as legal conclusions.  They further argue that a police procedures expert's opinion regarding the ultimate issue of use of force and violations of constitutional rights are inadmissible.  *Pratt v. Harris County, Tex*., 822 F.3d at 181; *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003); *McBroom v. Payne*, 478 F. App'x 196, 200 (5th Cir. 2012). *United States v. Teel*, 299 F. App'x 387, 389 (5th Cir. 2008); *Jadbabaei v. City of Florence, Miss*., 3:13Cv247-DPJ-KFB, 2014 WL 4851278, at *2 (S.D. Miss. Sept. 29, 2014).

Defendants additionally contend that Grafton's opinions as to how the situation could have been handled differently are not sufficient to defeat summary judgment on qualified immunity.  As long as "a reasonable officer could have believed that his conduct was justified," a plaintiff cannot "avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *City & Cty.*

*of San Francisco, Calif. v. Sheehan*, 575 U.S. 600; 135 S.Ct. 1765, 1777–78; 191 L.Ed.2d 856

(2015) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); comparing *Saucier v.*

*Katz*, 533 U.S. 194, 216, n. 6, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (Ginsburg, J., concurring

in judgment) ("'[I]n close cases, a jury does not automatically get to second-guess these life and

death decisions, even though a plaintiff has an expert and a plausible claim that the situation could

better have been handled differently.'") (quoting *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695

(1st Cir. 1994)); *see also Moore v. LaSalle Corr., Inc.*, 3:16-CV-01007, 2020 WL 6389183, at *14

(W.D. La. Oct. 30, 2020).

Finally, Defendants further note that Grafton's testimony essentially confirms that

McKinney did not use force that was clearly unnecessary and objectively unreasonable. [56]

Accordingly, McKinney is entitled to qualified immunity.

Because Plaintiffs do not address Defendant's arguments in their opposition, and do not

offer Grafton's testimony or report in support of their opposition, the Court concludes that

Defendants' arguments are not opposed. Therefore, Plaintiffs' expert cannot defeat summary

judgment in favor of Green and McKinney.  Having so found, Defendants' motion in limine [Doc.

No. 24] should therefore be denied as moot.

### C.   In the Absence of a Constitutional Violation, are the City of Bastrop and Bastrop Police Department Entitled to Summary Judgment?

Plaintiffs allege that the City of Bastrop and its policymakers, specifically the Bastrop City

Council, Mayor Henry Cotton and Chief of Police, Chief Allen Campbell "failed to properly train,

supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who

should have been known, to engage in the use of excessive force and/or deadly force, including

---

[56] Grafton deposition [Doc. No. 23-14, pp. 64 – 65.

those officers repeatedly accused of such acts."[57]  Plaintiff also alleges that the Bastrop City Council, Mayor and Chief Allen Campbell had a duty, but failed to implement and/or enforce policies, practices and procedures for the Bastrop Police Department ("BPD" ) that respected Thomas Johnson, III's constitutional rights to assistance and protection."[58]

Defendants Green and McKinney argue that, because there was no constitutional violation by Green or McKinney, there can be no liability on the part of the Defendants City of Bastrop and Bastrop Police Department.

In their opposition, Plaintiffs merely respond that because the actions of the defendant officers were unconstitutional, Bastrop Police Department as a municipality is liable when its employees violate the Constitution. [Doc. No. 36, p. 16]

The Court is inclined to agree with Defendants Green and McKinney. "A local government entity or municipality is not subject to liability under § 1983 by virtue of the doctrine of respondeat superior." *Campbell v. Sturdivant*, 3:20-CV-00068, 2020 WL 7329234, at *9 (W.D. La. Nov. 25, 2020), *report and recommendation adopted*, 3:20-CV-00068, 2020 WL 7323904 (W.D. La. Dec. 11, 2020) (citing *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985)). "Thus, to impose § 1983 liability against a government entity for the misconduct of one of its employees or officers, plaintiff must demonstrate that the constitutional deprivation was caused by a policy or custom of the entity." *Campbell, supra* (citing *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006); *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). Specifically, a plaintiff must identify (a) a policymaker, (b) an official policy or custom or widespread practice, and (c) a violation of constitutional rights whose "moving force" is the

---

57 [Doc. No. 1, ¶ II(2)]
58 [*Id*. at ¶ II(3)]

24

policy or custom. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

A municipality cannot be held liable when its employee did not violate the Constitution. *Malbrough v. Stelly*, 814 Fed. Appx. 798, 806 (5th Cir. 2020) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)).

However, the only Defendants who have moved for summary judgment are Green and McKinney.

### D.   *Sua Sponte* **Notice**

Given the Court's findings that Green and McKinney are entitled to summary judgment dismissing Plaintiffs claims against them on the basis of qualified immunity, the Court hereby gives Notice that it intends to *sua sponte* enter summary judgment in favor of the City of Bastrop through Henry Cotton, Mayor; and, the Bastrop Police Department through Allan Campbell, Chief of Police, denying Plaintiffs' claims against them with prejudice.  Plaintiffs have twenty-one (21) days to reply to this Notice. Defendants may file a response to Plaintiffs' reply within seven (7) days after the reply is filed.  If no reply is filed, the Court will enter judgment in favor of said Defendants.

## III. CONCLUSION

For the foregoing reasons, Green and McKinney are entitled to summary judgment and a dismissal of Plaintiffs' claims against them, with prejudice.  Green and McKinney's use of force was presumptively reasonable under the circumstances, and there was no constitutional violation. Even if there were a constitutional violation, Plaintiffs' cannot point to any clearly established law that would defeat Green and McKinney's defense of qualified immunity.

Accordingly, Defendants' "Motion for Summary Judgment on the Issue of Joshua A. Green and John L. McKinney's Qualified Immunity," [Doc. No. 23] is GRANTED.    Plaintiffs' claims against Green and McKinney are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 17th day of March, 2021.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**